Councilor prepared to hear your argument. Thank you. Your honor. Chad freeze on behalf of Jeffrey Garrett roads. May please record Mr. Lemke, all the panel appreciate you taking the time to hear this case.  We're near the end of the day at least. And this is a case that Mr. Lemke and I have lived now for a couple of years and it's a little bit of an unusual case. There's five assignments of air that we have assigned. I think what I will do is I'll start with the fifth assignment of air in our brief, which I think is if the court rules in our favor on that issue. It does not need to get to the other four. And that would be the issue that we raised approximately 10 days prior to sentencing. And that was the motion to have the district court recuse herself from sentencing Mr. Rhodes. This case started out with Mr. Rhodes being indicted in very early 2019 in September, late September, early October, 2019, a cellmate of his name, Justin Fletcher was indicted as well. The indictments for Mr. Fletcher that came down were for threatening judge Rose threatening the clerk of court in the Southern district, threatening a probation officer and threatening an assistant us attorney. When that indictment came down, the Southern district of Iowa recused itself across the board from Mr. Fletcher's cases and the cases were shipped off to the district of Nebraska and they were assigned to the U.S. Attorney's office in Nebraska, as well as I think eventually judge battalion in Nebraska. Mr. Rose's case proceeded through the system and I should stop and clarify myself in September of 2019 Mr. Fletcher had pending cases in the Southern district of Iowa for which I was his attorney. I had to withdraw because I was also identified by the FBI as a potential target of Mr. Fletcher's anger and he had made threats against me, but those were not indicted. So I withdrew from Mr. Fletcher's representation. Mr. Rose took his case up to about a week before trial in February of 2020 and he pled to both counts of the indictment straight up. The day of his guilty plea, Mr. Rhodes indicated to me on that day that he had information concerning an individual in jail, that individual was Mr. Fletcher. Following the hearing, I met with Mr. Crickbaum outside the courtroom, indicated that Mr. Rhodes had this information and Mr. Crickbaum was very careful about the information. And he would just simply pass along the information that Mr. Rhodes had some information he wanted to then proffer concerning this case. Judge Rhodes had taken the plea, or Judge Rose, I'm sorry, Judge Rhodes had taken the plea and the information was passed along. In late February, early March, my client Mr. Rhodes was interviewed by the FBI. I was not present, no one from the Northern or Southern district of Iowa was present, just the FBI. The FBI contacted me and said his information was helpful and that was the extent of the information. As the brief talks about the cases kind of both went along through the summer of 2020, Mr. Rhodes was subpoenaed a couple of times for Mr. Fletcher's trial. Again, the exact knowledge of what Mr. Rhodes was going to testify to was unknown to the Southern district of Iowa and to myself. Mr. Rhodes was taken to Omaha in mid October. Mr. Fletcher was going to trial and on the very eve of trial, Mr. Fletcher decided to plead. That coincided with becoming very close to Mr. Rhodes's sentencing. On October 22, I received an email from Mr. Crickbaum talking about the 5K motion, because at that point, the Southern district of Iowa was not going to make a 5K motion because of his prior recusal stance. The district of Nebraska was going to make the recusal motion. The Southern district of Iowa did an about face and said that Washington told them that now the Southern district of Iowa could make the recusal motion. In that same communication, Mr. Crickbaum indicated that he was curious about the role of Judge Rose at the sentencing and the potential conflict of interest that she may have regarding my client, and vis-a-vis the Fletcher case. He wanted to bring it to Judge Rose's attention and make a record on it at sentencing if my client would waive it. It was at that point that we got into what I would term the meat and potatoes of what Mr. Rhodes knew and what he was going to testify to because of the 5K motion that was going to be made. Why wouldn't you have known any of that before? Were you trying to stay away from those interviews because you had previously represented Mr. Fletcher? I was. I was trying to avoid any allegation by Mr. Fletcher of saying that I was somehow tainting the testimony of Mr. Rhodes and trying to steer or manipulate the proceedings that way. Mr. Fletcher is a very dangerous man, a very manipulative man. And I was purposely trying to stay away from that. But the moment we learned, both Mr. Crickbaum and myself, of what his cooperation included, and that was the same day, that was about October 22, we met and I filed a motion to recuse. And the motion to recuse basically was based upon the fact that the judge is now going to have to make a finding of credibility of how credible Mr. Rhodes' information was to make that 5K determination. But then on the flip side of that, there's a whole bunch of factual determinations the court was going to have to make on these other issues, the 2B2.2 issue and the five-level enhancement there and the number of victims and things like that. So she's going to make credibility findings on both ends. It was kind of the both ends against the middle issue and put the court in a really, in our opinion, difficult position. So we didn't make the motion lightly. But the court had, and the court said in its order, in the oral ruling, that it didn't know anything about Mr. Fletcher's case. And there's a reason for that. The court didn't want to know anything about Mr. Fletcher's case. So I think it just made the court in a really conflictual position in this case because it had to make a finding about Mr. Rhodes' credibility. And the court found Mr. Rhodes to be very credible and gave him a large reduction, which the court in its ruling said it was a 10% reduction, but really more of a 10-year reduction in her opinion. But then when she went and talked about the facts of the case in his own personal circumstances, she found Mr. Rhodes to be very incredible. So it just kind of sits over the court or over the court's rulings like a specter. And as far as it being timely or untimely, it came out the very moment Mr. Crickbaum and I learned of the information and the very moment the government made it an issue. So that's where we're going with the issue of motion for recusal. I think it's been very well briefed. I think it's been very well discussed, very well pled and talked about in the records. I understand the court has discretion and we didn't make the motion very lightly, but I think that's the kind of the overlying issue in this case that the court needs to consider. And unless there's any questions, I'd like to reserve my remaining time for rebuttal. You may do so. We're prepared to hear from the government. Thank you. May it please the court. Your Honors, I'd like to begin where Mr. Friest did and that's discussing the recusal issue. Regarding the timeliness, of course, Judge Rose denied the motion for two reasons. She first ruled that the motion for recusal was untimely. And then alternatively, she ruled that the motion failed on the merits. She provided a brief written ruling to that effect before sentencing. And then she expanded upon her reasons for denying the motion during the sentencing hearing itself. Regarding the timeliness... Counsel, with regard to the timeliness issue, did the district court have the information before it that was just explained to the court? Specifically which information, Your Honor? Well, just that the reason for the timing of the motion for recusal and why it was filed when it was filed. Regarding Mr. Friest's statements to the effect that I think he was steering clear of what Mr. Rhodes stated in his prior interview due to ethical concerns with respect to his prior representation of Mr. Fletcher. Judge Gross, I don't think that was in the record at all. That was not raised specifically with Judge Rose before she ruled on the motion for recusal. What the record does show, Judge, is that Mr. Rhodes provided a proffer interview with the FBI in February of 2020. That's some eight months before he ultimately moved for recusal during that proffer interview. And the proffer report is in the record, Your Honor. This is Exhibit 11 to the government's sentencing materials. The proffer report makes clear that Mr. Rhodes provided information about threats that Mr. Fletcher made to a number of individuals, specifically including Judge Rose. So we have eight months before sentencing Mr. Rhodes telling law enforcement that Mr. Fletcher had threatened Judge Rose who was presiding over Mr. Rhodes' case. And then in the intervening eight months, we have in May of 2020, Mr. Rhodes' counsel filed objections to the pre-sentence report. And in those objections specifically noted that Mr. Rhodes had cooperated against Fletcher and provided information specifically including threats against judges in the Southern District of Iowa. And then in May, also in May of 2020, the parties jointly agreed to continue Mr. Rhodes' sentencing for the very particular purpose of allowing Mr. Rhodes to continue his cooperation against Mr. Fletcher. Over the course of the summer in 2020, Mr. Rhodes was subpoenaed three times in June, July, and September of 2020 to actually testify against Mr. Fletcher. Despite all of these things, Mr. Rhodes' counsel never filed a motion to recuse until I believe it was October 26th when we were approximately nine days from sentencing in this case. On that record, Your Honor, I think Judge Rose was correct to conclude that the motion was untimely. This court's cases hold that a recusal motion must be made at the earliest possible moment when the potential grounds for recusal are known. I would also note there was a case that is not cited in the party's briefs, but it's the Medtronic case from 2010 from this court at 623 F. 3rd, 1200. That's a case where this court held that a recusal motion must be made when the party knew or with due diligence could have known of the basis for recusal. I think here we have a documented law enforcement report of an interview that happened eight months before sentencing in which Mr. Rhodes specifically informs law enforcement that Mr. Fletcher had threatened Judge Rose, the judge presiding over Mr. Rhodes' case. I think certainly Mr. Rhodes knew the basis for a recusal motion. He knew at that time in February of 2020 that he had proffered information about threats against the judge that was going to be sentencing him. Shortly before that proffer interview, he appeared in court and pled guilty in front of Judge Rose. So certainly when he gave that interview, he knew that he had provided information on a case in which Judge Rose was a victim. And to the extent Mr. Freese purposely avoided learning the details of that, I think at minimum the defense was on inquiry notice at that point and with due diligence could have known of the basis for the recusal motion. I think that's particularly true after Mr. Rhodes is repeatedly subpoenaed to testify at Mr. Fletcher's trial. When defense counsel files objections to a pre-sentence report that specifically cite his cooperation against Fletcher and threats against judges in the Southern District of Iowa, I think all of those facts and circumstances would put an attorney on notice that if he doesn't already know the actual basis for a recusal motion, he is charged at that point with sufficient knowledge to look into the matter further and make a motion if that's the appropriate course. Regarding the... Sorry, Judge. Sorry, I was muted. Do I understand that the government's position is that if in fact the motion is untimely, there is no obligation for the judge to make any further inquiry about her continuing to sit on the case? I think that's right, Your Honor. I think that's the way some of the cases that this court has decided address the issue. I don't recall. I've obviously looked at cases where recusal motions were denied as untimely and affirmed, and I don't recall any discussion in those cases that the court was required to go beyond the timeliness inquiry and address, well, even if it was untimely, whether recusal was required. Now, as I looked at Judge Rose's discussion of the recusal, she starts off and says, I have no direct conflict because I have no actual knowledge of anything. I have intentionally avoided having any information given to me. And frankly, I know nothing about Mr. Fletcher or Mr. Fletcher's case. Okay. And she says that as a result of that, she's not sentencing Mr. Fletcher, right? She's sentencing a witness who's testifying against Mr. Fletcher. So she says that I don't have a conflict under federal law or the code for United States judges, right? And then she goes on to analyze it with the standard that is applied when a judge does not have a conflict, but there is a question that might reasonably be raised on whether or not the judge is in a position to be fair and impartial. And that means we need to have, the standard is, is that you take a fully informed person who's walking down the street and you ask them whether they reasonably have concerns about the ability of the judge to be impartial. Now, that's the legal analysis that's done. Now, in this case, there's a lot of talk about Fletcher and there's a lot of talk about how that may end up biasing the outcome. But it seems to me that when you're the judge doing that analysis, you got to do the analysis on both ends and sort of like, would a reasonable person suspect you might be partial because you're going to give greater credit to Mr. Rhodes and you're going to reduce Rhodes's sentence by a lot more, as well as the idea that you're going to, you know, sort of punish based on your knowledge that he was sitting in on these conversations with Rhodes and overheard them or with Fletcher and overheard them, right? I mean, it kind of goes both ways. And, you know, you think that that analysis that the judge did is correct. And I'm just a little bit kind of wondering about, you know, what would that reasonable person on the street actually think? So what's your best argument to say that they wouldn't be concerned? Well, first, Judge, regarding the legal standard that Judge Rhodes applied, I think she applied the correct legal standard. It's pages 22 and 23 of the sentencing transcript when she's kind of summing up her ruling on this, Judge Rhodes said, so given all of those facts, I do find that my impartiality wouldn't be reasonably questioned by an average person who knew all of the facts. So I think she did apply that correct legal standard, Judge. Regarding your broader question, I will concede, of course, that I think this is a unique factual scenario where you have a defendant cooperating against a defendant who has threatened the judge presiding over the cooperating defendant's case. Fortunately, that's not a scenario that we encounter very often. I would say, Your Honor, that this court has repeatedly held that recusal isn't required when a defendant directly threatens a judge. And as I reason my way through this, I think this court has repeatedly said a judge is presumed to be fair and impartial even when a defendant is threatening them, threatening them of physical harm, that that doesn't require recusal. It's a stretch for me, I think, to say that, well, here, where we have this kind of speculative, you know, well, perhaps she thought that she didn't want to be too favorable on the cooperation to look like she was being, you know, overcompensating for this bias. I think, given the threat cases, Your Honor, I think any kind of impartiality in this case is purely speculative. Right. And the threat cases all are about the fact that that's a method of judge shopping, you know, that basically you threaten all the judges until you get the judge you want, right? And so that's why they kind of allow the district judge to say, I think it's a ruse, right? This seems to be sort of more like somewhat like a half a step remote from that. But I guess that's not a question. It's an observation. So sorry. No problem. Thank you, Your Honor. I see I'm out of time. I'm happy to address any questions about the other issues, but if not, thank you for your time. Thank you. Yeah. One minute and 16 seconds for rebuttal. Thank you, Your Honor. I'll admit, perhaps I was caught a little flat footed as we got closer to Mr. Rhodes's sentencing. And I'll say that because, and I'll refer the court to the record where I replied to the government's resistance to the motion to recuse. All along, we were expecting that the district of Nebraska was going to interject themselves on the 5K motion. That's what we were told all along. Up until after Fletcher pled. The email conversation that I included in our response to their resistance is very clear that Mr. Crickbaum told Judge Rhodes we wanted to sentence Rhodes after Fletcher's trial. And there's also a discussion in there that the district of Nebraska would weigh in. And the reason I was caught flat footed is because Judge Rhodes, certainly I would submit, would not have stayed on the case if the prosecutor from the case where she was a victim would have interjected himself into a case where she was presiding. And I say that because there was a case in the Southern District where Mr. Klein, the prosecutor from Nebraska, interjected himself and then she recused herself. That gentleman was also a witness against Mr. Fletcher and she recused herself in that case.  When the U.S. attorney for the Southern District of Iowa was then told that we're not gonna do that now, we're gonna make the motion on behalf of the District of Nebraska, that caused a little flat footed. So that's where we're coming from. That's where the issue of timeliness comes in. And that's kind of where our motion rises and falls. Thank you. Thank you. Thank you to both council. We'll take the matter under advisement.